

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIAH R. L.,[1] | Case No. 3:25-CV-1424-GPC-MMP |
| Plaintiff, | |
| v. | **ORDER REVERSING COMMISSIONER'S DECISION AND REMANDING FOR FURTHER PROCEEDINGS** |
| FRANK BISIGNANO, Commissioner of Social Security, | |
| Defendant. | **[ECF No. 1]** |

On June 4, 2025, Petitioner Mariah L. ("Plaintiff") filed this action seeking judicial review of the Commissioner of Social Security's final decision denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act. ECF No. 1. The action has been fully briefed. ECF Nos. 12, 17, 18. Having reviewed the parties' arguments, the record, and the applicable law, the Court REVERSES the decision

---

[1] Pursuant to Civil Local Rule 7.1(e)(6)(b), "[o]pinions by the Court in [Social Security cases under 42 U.S.C § 406(g)] will refer to any non-governmental parties by using only their first name and last initial."

1

of the Commissioner and REMANDS this matter to the ALJ for further administrative proceedings consistent with this order.

**I.      Background**

Plaintiff filed an application for disability insurance benefits pursuant to Title II of the Social Security Act on March 13, 2022, alleging a disability onset date of January 22, 2019. AR 17, 189. Plaintiff later amended her alleged onset date to January 1, 2020. AR 17. The Commissioner denied Plaintiff's claims for benefits upon initial review on July 19, 2022 and again upon reconsideration on November 6, 2022. AR 70, 88. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which took place on August 31, 2023 before ALJ Andrew Verne. AR 35. On May 20, 2024, ALJ Verne issued a decision denying Plaintiff's claim for benefits, finding that although Plaintiff could not perform her past relevant work, she could perform work that exists in significant numbers in the national economy; thus ALJ Verne concluded that Plaintiff had not been disabled from this alleged disability onset date through September 30, 2022, the date last insured. AR 26-28. Plaintiff requested review of the ALJ's decision by the Appeals Council, which denied Plaintiff's request for review on May 14, 2025. AR 1. On June 4, 2025, Plaintiff commenced the instant action seeking judicial review of the Commissioner's decision. ECF No. 1.

**A.      Plaintiff's Background and Testimony**

Plaintiff was born on June 6, 1985. AR 189. Plaintiff worked at different times as a reservation clerk, gambling dealer, and bookkeeper for over nine years. AR 26, 239. On July 22, 2019, she became unable to work due to her disabling condition. AR 206. Plaintiff claims that she suffers from bipolar 1 disorder, schizoaffective disorder: bipolar type, generalized anxiety disorder, and mood disorder. AR 20. She claims that she hears voices in her head that are overwhelming and distracting. AR 227. According to Plaintiff, she cannot "function when the voices are really bad" and, some days, she "can barely get

2

out of bed or off the couch." AR 234. Further, she reports she sleeps a lot because her brain gets so tired, and reports taking Benadryl to fall asleep when the voices worsen. *Id.*

Plaintiff lives with her husband, Matthew L., and their two children. AR 216-17, 227. On most days, Plaintiff takes her medication, takes her children to her mother-in-law's home for help with childcare, and takes her children back home. AR 217, 228. If Plaintiff gets overwhelmed with the voices or triggers, she takes a shower and goes to bed. *Id.* According to Plaintiff, falling asleep can be "miserable" when hearing voices in her head. AR 228 Further, Plaintiff has difficulty keeping proper hygiene as it takes a lot of effort to dress and bathe herself. *Id.* Plaintiff's husband often reminds her to take her medication and care for her personal needs. AR 229. Although she used to cook big dinners, she now only makes simple meals, or sometimes nothing at all, because cooking is too stressful and triggers her. *Id.* Further, Plaintiff feels safer inside and does not spend time with others, except for her family on occasion. AR 230-31.

At the August 31, 2023 hearing before the ALJ, Plaintiff testified that she has a Bachelor's degree in Business and Accounting and was one class shy of completing an online Master's program. AR 40-41. Plaintiff testified her mental health began deteriorating between 2011 to 2013, while she was married to her ex-husband. AR 42. Plaintiff has four children and shared she lost custody of two children "because of hearing the voices in [her] head." AR 46. Plaintiff also testified that she "thinks one of voices that [she] hear[s] is [her] own voice," and that it will repeat inside her head if she hears someone talking. AR 47. As for her ability to work, Plaintiff testified that she cannot concentrate or accomplish anything because she hears voices and thoughts in her head on repeat. AR 43-44.

**B.    Lay Testimony from Plaintiff's Husband, Matthew L.**

On April 9, 2022, Plaintiff's husband, Matthew L. filed a function report detailing his observations of Plaintiff's symptoms and functional limitations. AR 216-23. He stated

25-CV-1424-GPC-MMP

that Plaintiff hears voices in her head. AR 217. He also noted that before Plaintiff's mental illness escalated, she was able to care for her children and work without help, but now Plaintiff cannot because of difficulties concentrating and staying stable. *Id.* As a result, Mr. L.'s mother now watches their children five days a week. *Id.* Plaintiff's husband also shared that Plaintiff was fired from her last job because she could not concentrate. AR 222. He reported not trusting Plaintiff with her ability to handle money after Plaintiff's last bad mental episode when she did not realize how much she spent. AR 220.

Additionally, he must remind Plaintiff to take her medication every morning and afternoon and to take a shower some days. AR 218. He also reminds Plaintiff to get groceries and encourages her to complete household chores like sweeping or wiping down counter tops. AR 218-20. According to Mr. L., Plaintiff has difficulties holding conversations and socializing because the voices in her head are constant. AR 220-21. He also stated Plaintiff has a fear of being around too many people because the voices worsen. AR 222. As for Plaintiff's physical abilities, Mr. L. noted that Plaintiff struggles with talking, hearing, memory, concentration, following instructions, and getting along with others. AR 221. In general, he reports that Plaintiff does not function the same as before her mental illness, and "she has to be reminded about things and have her hand held now to do some things that are [part of] normal life." AR 223.

### C. The Medical Record

#### 1. Maui Memorial Medical Center

The earliest medical records in the AR date back to May 7, 2015, when Dr. Ramakrishna Rao performed a psychiatry evaluation of Plaintiff at Maui Memorial Medical Center. AR 309. Dr. Rao observed that Plaintiff was delusional, including that Plaintiff believed her children were murdered by her father, despite reports confirming they were alive. *Id.* Dr. Rao also reported that Plaintiff placed bleach on her right cheek

25-CV-1424-GPC-MMP

to "heal" her face, prompting medical evaluation. *Id.* With regards to Plaintiff's behavior, Dr. Rao reported that Plaintiff had paranoid projections and was not cooperative. *Id.* Specifically, Plaintiff's insight and reliability were noted as poor. AR 310.

### 2.   San Diego Sheriff's Department Records

Plaintiff underwent several mental health assessments while incarcerated. AR 321-60. On February 5, 2018, a clinician completed an assessment of Plaintiff for Administrative Segregation Placement. AR 322-33. The report noted Plaintiff's cell flooded because she had been taking a continuous "bird bath" and was washing the cell walls with toilet water. *Id.* It also noted that Plaintiff told staff she was "part of the CIA," and that she "need[ed] a razor to shave [her] hair." *Id.* On February 7, 2018, a psychiatric examination was completed and described Plaintiff as delusional and illogical. AR 324.

On March 28, 2018, Plaintiff underwent an additional psychiatric evaluation where she shared her history with depression, which she described as "situational depression." AR 327-28. Plaintiff reported feelings of low energy, poor motivation, hopelessness, and decreased appetite. *Id.* According to the encounter notes from the visit, Plaintiff declined psychiatric medication. AR 329. On May 31, 2018, a psychiatrist progress report reflected Plaintiff's irritable and uncooperative attitude, including Plaintiff telling clinicians "[they] need to leave." AR 334-35. The report also noted that housing deputies observed Plaintiff talking to herself and yelling, and that her overall mental health seemed to be declining. *Id*

On June 18, 2018, the decision was made to admit Plaintiff on a section 5150 involuntary hold for grave disability. AR 338. Plaintiff underwent an urgent psychiatric assessment after housing deputies reported that Plaintiff "flooded her cell in an attempt to shower," repeatedly called the intercom box "making incoherent and nonsensical statements," and yelled and cursed "all day and night." *Id.* According to the report, Plaintiff's hygiene and grooming were poor, her cell floor was filthy, and the toilet was

25-CV-1424-GPC-MMP

filled with trash. *Id.* Additionally, the clinician reported that Plaintiff's speech was "completely nonsensical," and she would chant, "MaMaMaMaMa." *Id.* The clinician started Plaintiff on psychiatric medication including Zyprexa for psychosis and Ativan for severe anxiety. AR 340. On June 20, 2018, during the involuntary hold, Plaintiff was seen at her cell door with urine underneath her door. AR 345. The report also noted that Plaintiff was yelling nonsensical words, disorganized in thinking, and could not participate in a discussion about her medication. *Id.* On June 21, 2018, the medical encounter form described Plaintiff as incoherent and not oriented to the situation. AR 348. On June 28, 2018, Plaintiff continued refusing antipsychotic medication and displaying a lack of insight about her symptoms and behavior. AR 353. Plaintiff did not comply with her medication until a Riese finding was upheld. AR 356. Then, on July 4, 2018, after Plaintiff's psychosis and mood improved, she was discharged from the involuntary hold. AR 355.

On August 30, 2018, Plaintiff denied symptoms of depression or mania. AR 359. Additionally, Plaintiff reported that her psychiatric medications, Zyprexa and Lexapro, were effective. AR 359-60. On September 6, 2018, Plaintiff was released from incarceration. AR 398.

### 3. Tri-City Medical Center

On September 16, 2018, Plaintiff visited the emergency department at Tri-City Medical Center and requested mood stabilizing medication. AR 396-400. During the visit, Plaintiff reported episodic auditory hallucinations and depression. *Id.* Additionally, Plaintiff told medical staff about her suicidal ideation with plans to run into traffic. AR 425. Although Plaintiff explained she had no intention of carrying out her ideation, she expressed "the thoughts themselves are very disturbing to her." AR 428.

On September 25, 2018, Plaintiff underwent a psychiatric assessment performed by Dr. Karel Placek. AR 378-93. During this visit, Plaintiff reported being medication

25-CV-1424-GPC-MMP

compliant but shared that she could still hear the voices in her head between one to five times per day. AR 378. Dr. Placek noted that Plaintiff was alert, normally orientated to her situation, coherent, and cooperative. AR 378. On December 27, 2018, Dr. Placek assessed Plaintiff because Plaintiff reported hearing voices, including her own loud voice and a man's voice, "all the time." AR 393.

On January 4, 2019, Plaintiff returned to the Tri-City Medical Center's emergency department. AR 416-17. Dr. Dorothy Brown performed an evaluation of Plaintiff where Plaintiff complained of having a brain tumor and hearing voices of her thoughts play back to her. *Id.* Plaintiff also reported having a five-year long headache that she experiences daily but that does "come and go." *Id.* Additionally, Plaintiff told Dr. Brown that she complied with taking her medication for the past six months. *Id.*

On February 11, 2019, Dr. Placek reassessed Plaintiff and reported that Plaintiff told her she felt much better. AR 392. Then, on April 18, 2019, Dr. Placek recorded that Plaintiff denied experiencing psychotic symptoms or depression. AR 389.

### 4. Plaintiff's Pregnancy – August 2019

In August 2019, Plaintiff discovered that she was pregnant. AR 410. On August 16, 2019, Dr. Chistopher Dang performed an assessment of Plaintiff for pelvic pain and reported she presented with normal mental status. AR 410. On January 11, 2020, Dr. Linsey Ball performed an evaluation of Plaintiff after Plaintiff returned to the emergency department for flulike symptoms. AR 403-05. Dr. Ball reported that Plaintiff's psychological symptoms were negative for depression and that Plaintiff presented with appropriate mood and affect. *Id.* Dr. Ball also noted Zyprexa among Plaintiff's active prescriptions. *Id.*

On April 30, 2020, Plaintiff transitioned to hospital care at University of California, San Diego Health System for her pregnancy. AR 636-37. Although Plaintiff's problem list included bipolar 1 disorder and schizophrenia, the remainder of her medical

25-CV-1424-GPC-MMP

records throughout her pregnancy do not notate her mental health concerns. *Id.*; *see* AR 457-690. On May 13, 2020, Plaintiff underwent a routine postpartum exam and during the visit, nurse practitioner Kelly Philips provided Plaintiff with education regarding postpartum depression. AR 461-62.

### 5. Canyon Ridge Hospital - Dr. Kevin Wethey

On January 6, 2022,[2] Plaintiff was admitted to the hospital on a five-day section 5150 involuntary hold as a danger to others and gravely disabled. AR 697. She was treated by Dr. Kevin Wethey. AR 697-710. According to Plaintiff's past psychiatric history, this was approximately Plaintiff's eighth hospitalization for manic behavior. AR 699. At the time, Plaintiff resided at a board and care residential treatment facility and was brought to the hospital after she refused her medications and displayed erratic, paranoid, and aggressive behaviors towards staff. AR 699, 702. During the initial assessment, Dr. Wethey reported that Plaintiff was hyperverbal, paranoid, and lacked insight into her admission to the hospital. AR 699. Plaintiff also told Dr. Wethey that she was a vampire. AR 700.

On January 8, 2022, after Plaintiff received medications, Dr. Wethey reported that Plaintiff was calmer and more cooperative and that her thought process was more linear. AR 708. On January 10, 2022, Plaintiff told Dr. Wethey that she felt more used to her medication and understood that her condition worsened when she stopped taking her medication. AR 710. Then, on January 11, 2022, Plaintiff was discharged. AR 697.

### 6. D'Amore Healthcare Residential Treatment

On January 11, 2022, following Plaintiff's discharge from an involuntary hold under section 5150, Plaintiff was re-admitted to D'Amore Healthcare Residential

---

[2] There are no medical records pertaining to Plaintiff's mental health status or treatment between May 2020 and January 2022 in the record.

25-CV-1424-GPC-MMP

Treatment for continued care. AR 719. After admission, Plaintiff reported that she enjoyed her new medication and that she felt happier. AR 743. According to a biopsychosocial assessment, Plaintiff was experiencing mania symptoms focused on grandiose beliefs, inappropriate euphoria, inappropriate irritability, poor judgment, and inappropriate social behavior. AR 793. It also noted that Plaintiff's high-risk behaviors while manic included overspending, dangerous driving, and being awake for days. AR 794. Additionally, the assessment listed Plaintiff's history of stopping her medication and self-isolation as unresolved issues that could affect her continuing recovery. AR 803. During Plaintiff's treatment, she received the primary diagnosis of bipolar disorder with psychotic features. AR 807. Plaintiff completed the program on February 14, 2022. *Id.*

### 7.    Post-Residential Treatment Psychiatric Assessments

On February 22, 2022, Dr. Jaga Glassman performed a psychiatric risk assessment of Plaintiff after she exited the residential treatment program. AR 813-18. Plaintiff sought evaluation for ongoing mental health care and medication refills. AR 810-12. Upon admission, Plaintiff told Dr. Glassman she felt very stable on her medication but still had occasional auditory hallucinations and brief delusional thoughts. AR 813. Then, on March 4, 2022, Plaintiff returned to Dr. Glassman and reported fear of an incoming manic episode, increased auditory hallucinations, and anxiety. AR 818-21. During the visit, Dr. Glassman reported on Plaintiff's compliance to her medication. AR 821.

On March 21, 2022, Plaintiff underwent an additional psychiatric evaluation at CHE Behavioral Health Services. AR 879-87. Plaintiff reported requiring hospitalization for her post-partum depression. AR 879. Plaintiff also shared that she was experiencing occasional visual hallucinations of horoscopes and slot machines, as well as auditory hallucinations. *Id.* Regarding her medication, Plaintiff reported compliance but told the nurse Zyprexa worsened her hallucinations, while another medication, Invega, had reached its limits on alleviating her symptoms. *Id.*

25-CV-1424-GPC-MMP

On April 4, 2022, Plaintiff completed a psychotherapy evaluation due to symptoms of anxiety and depression. AR 901-02. The clinician reported that Plaintiff's symptoms impair functioning in the areas of sleep, relationships, life skills, and work. *Id.* On April 14, 2022, Plaintiff attended a follow-up appointment. AR 903. Plaintiff told the clinician that increased stressors from caring for her children worsens her auditory hallucinations. *Id.* Specifically, Plaintiff reported hearing voices repeatedly say, "Oh my gosh, Mariah." *Id.* During the visit, the clinician recorded that Plaintiff struggles with stress-induced psychotic features of her bipolar disorder, which include auditory hallucinations, and that she can manage the voices through medication. *Id.*

On May 23, 2022, Dr. Julian Lagoy performed an evaluation of Plaintiff and noted Plaintiff told Dr. Lagoy she was experiencing auditory hallucinations and hearing voices. AR 923-25. During the visit, Dr. Lagoy reported Plaintiff's judgement was within normal limits. *Id.*

### 8.     Dr. Gregory Bishop

Dr. Gregory Bishop is Plaintiff's treating psychiatrist. AR 960. On November 8, 2022, Dr. Bishop examined Plaintiff and reported she had adequate insight and cooperative behavior but was experiencing auditory hallucinations. AR 1058. On March 27, 2023, Dr. Bishop reported that Plaintiff is "unable to hold any position due to frequency of mood swings and effect of auditory hallucinations." AR 963. Dr. Bishop identified Plaintiff's symptoms as delusions, hallucinations, difficulty concentrating, flight of ideas, distractibility, easily fatigued, detachment from social relationship, and disproportionate anxiety. AR 961.

### 9.     Dr. Denise Joseph

On October 14, 2023, Dr. Denise Joseph performed a consultive examination of Plaintiff. AR 1294-1300. Dr. Joseph opined that Plaintiff has ongoing psychotic symptoms and auditory hallucinations that distract and interfere with accurate decision

10

making at a "moderate" level. AR 1294-95. Dr. Joseph found these limitations were documented by medical records prepared from 2011 to 2014. AR 1295. A review of the records also disclosed frequent psychiatric hospitalizations due to psychosis, near-suicide attempt, and trauma. *Id*. During the assessment, Dr. Joseph also reported that Plaintiff could sustain activity for thirty to forty-five minutes but also noted the duration is inconsistent because Plaintiff gets easily overwhelmed. AR 1299. As to Plaintiff's functional assessment, Dr. Joseph reported that Plaintiff can reason, understand, and remember simple instructions without restrictions. AR 1300. Dr. Joseph also reported that Plaintiff's ability to maintain concentration, persistence, and pace is moderately impaired because of frequent distractions from hearing voices. *Id.*

### 10. Vocational Expert's Testimony

At Plaintiff's ALJ hearing, Vocational Expert ("VE") Connie Guillory testified as to what jobs Plaintiff could perform given her limitations. AR 49-54. She characterized Plaintiff's most recent job as a registration clerk at the sedentary exertion level, with a Specific Vocational Preparation ("SVP") of 3. AR 51. For Plaintiff's prior positions, Ms. Guillory characterized Plaintiff's position as a bookkeeper at the sedentary exertion level, with an SVP of 6, as well as Plaintiff's position as a gambling dealer at the sedentary exertion level, with an SVP of 5. *Id*. Additionally, Ms. Guillory characterized Plaintiff's position as an accountant at the sedentary exertion level, with an SVP of 8, though Ms. Guillory noted that based on Plaintiff's testimony and the duration she held the position, Plaintiff likely did not perform the role for the time required to attain an SVP of 8. AR 50.

Next, ALJ Verne asked Ms. Guillory if a hypothetical claimant would be able to perform that past work given limitations similar to Plaintiff's. AR 51-52. Ms. Guillory responded that ALJ Verne's posed hypothetical limitations would rule out past work, thus leaving unskilled work options. AR 52-53. Then, ALJ Verne asked Ms. Guillory about

25-CV-1424-GPC-MMP

the types of unskilled jobs to which ALJ Verne's posed limitations would transfer. *Id.* Ms. Guillory offered the positions of (1) sealer at the sedentary level with an SVP of 2 and 15,000 jobs available; (2) inspector at the light level with an SVP of 2 and 101,000 jobs available; and (3) hand packager at the medium level with an SVP of 1 and 35,000 jobs available. AR 53.

Lastly, ALJ Verne asked Ms. Guillory if any work would be available if a hypothetical claimant with limitations similar to Plaintiff's were off task fifteen percent or more during the workday on a consistent basis. AR 53. Ms. Guillory responded that there would not be. *Id.* Counsel also asked Ms. Guillory if any work identified or any other work would be sustainable if a hypothetical claimant with limitations similar to Plaintiff's was absent more than four days per month. AR 54. Ms. Guillory again responded that there would not be work available. *Id.*

**D.     The ALJ's Decision**

For the purposes of the Social Security Act, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant meets this definition, the ALJ employs a five-step sequential evaluation. 20 C.F.R. § 404.1520(a). If the ALJ determines that a claimant is either disabled or not disabled at a step in the process, the ALJ does not continue to the next step. *See* 20 C.F.R. § 404.1520(a); *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009).

In brief, the ALJ considers whether the claimant is disabled by determining: (1) whether the claimant is "doing substantial gainful activity"; (2) whether the claimant has a "severe, medically determinable physical or mental impairment . . . or a combination of impairments that is severe" and that has lasted for more than 12 months; (3) whether the

25-CV-1424-GPC-MMP

impairment "meets or equals" one of the listings in the regulations; (4) whether, given the claimant's residual functional capacity ("RFC"), the claimant can still do his or her "past relevant work"; and (5) whether the claimant "can make an adjustment to other work." 20 C.F.R. § 404.1520(a)(4)(i)-(v). Between steps three and four, the ALJ must, as an intermediate step, assess the claimant's RFC. *See* 20 C.F.R. § 404.1520(e); *Bray*, 554 F.3d at 1222–23; *Garrison v. Colvin*, 759 F.3d 995, 1011 (9th Cir. 2014). The burden of proof is on the claimant at steps one through four but shifts to the Commissioner at step five. *Bray*, 554 F.3d at 1222.

Here, the ALJ applied the five-step sequential framework to determine that Plaintiff did not have a disability within the meaning of the Social Security Act from January 1, 2020, though September 30, 2020, the date last insured. AR 18, 28. At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since her alleged disability onset of January 1, 2020. AR 19. At step two, the ALJ determined that Plaintiff had severe impairments of bipolar 1 disorder, schizoaffective disorder, generalized anxiety disorder, and mood disorder. AR 20-21. At step three, the ALJ determined that Plaintiff did not have impairment or combination of impairments that met or medically equaled the severity of one of the impairments in the Listing, noting in particular that he had considered Listings 12.03, 12.04, and 12.06. AR 22 (citing 20 C.F.R. Part 404, Subpart P, App. 1 (20 C.F.R. 404.1520(d), 404.1525, and 404.1526)).

The ALJ further determined that Plaintiff had the RFC to perform a full range of work at all exertional levels with certain non-exertional limitations. AR 22-26. The ALJ stated the following regarding Plaintiff's RFC:

> [Plaintiff can be limited to]: understanding, remembering, and carrying out simple, routine tasks, with breaks every 2 hours; have no interaction with the general public and occasional, work-related, non-personal, non-social interaction with coworkers and supervisors (involving more than a brief exchange of information or hand-off of product; unable to perform highly time-pressured tasks such that the [Plaintiff] is limited to general goal-

25-CV-1424-GPC-MMP

oriented work, not time-sensitive, strict, production quotas (such as production rate pace work with strict by the minute or by the hour production quotas that are frequently and/or constantly monitored by supervisors or that are fast-paced); she can work in a low-stress environment where there are few workplace changes (such as…not having to switch from task to task), and [she] would only have minimal decision-making capability, for example, she would be unable to exercise substantial discretion in carrying out work activities.

AR 22-23.

At step four, the ALJ concluded that Plaintiff is not capable of performing her past relevant work as a Reservation Clerk, Gambling Dealer, or Bookkeeper. AR 26. At step five, the ALJ determined that Plaintiff could perform various jobs which exist in significant numbers in the national economy. AR 27-28. These included, for example, a sealer, an inspector, and a hand packager. AR 27.

## II.    Legal Standard

Section 205(g) of the Social Security Act ("the Act") permits unsuccessful claimants to seek judicial review of the Commissioner's final agency decision.  42 U.S.C. § 405(g).  The reviewing court may enter a judgment affirming, modifying, or reversing the Commissioner's decision, and may also remand the matter to the Commissioner of Social Security for further proceedings.  *Id.*

The scope of the reviewing court is limited; it may only "set aside the ALJ's denial of benefits . . . when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007) (internal quotations omitted).  "'Substantial evidence' means more than a mere scintilla, but less than a preponderance, i.e., such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).  However, "[w]here evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## III. Discussion

For purposes of the Social Security Act, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). The claimant carries the initial burden of proving disability. 42 U.S.C. § 432(d)(5); *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989). Here, the ALJ found that Plaintiff was not disabled. AR 28. Plaintiff argues that the ALJ erred as a matter of law by: (1) failing to provide the special procedures reserved for mental impairments, (2) failing to provide a mental RFC finding pursuant to SSR 85-16, (3) failing to provide clear and convincing reasons for rejecting Plaintiff's statements, and (4) failing to meet his burden of proof at Step Five. The Court will consider each of these grounds in turn.

Based on a review of the record, this Court finds that the ALJ failed to provide substantial evidence supporting her mental RFC finding and failed to provide specific, clear, and convincing reasons for rejecting Plaintiff's subjective symptom testimony.

### A. Special Procedures for Mental Impairments

First, Plaintiff contends that the ALJ failed to implement special procedures and did not properly address the paragraph C criteria at step three when evaluating the severity of Plaintiff's mental impairments. ECF No. 12 at 14-18. Defendant disagrees, arguing that the ALJ reasonably found Plaintiff did not meet the criteria of any disability listing, including listings 12.03, 12.04, and 12.06, and that substantial evidence supports the ALJ's step three finding. ECF No. 17 at 7-11.

At step three of the sequential evaluation process, the ALJ considers whether one or more of the claimant's impairments meets or equals any of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "listings"). 20 C.F.R. § 404.1520(a)(4)(iii). The

15

listings "define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing any gainful activity, not just 'substantial gainful activity.'" *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990) (citing 20 C.F.R. § 416.925(a)). When met, the listings' severity create a presumption of disability that makes any additional inquiry unnecessary. *Id.* "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Id.* at 530 (emphasis in original).

To satisfy listings 12.03 (schizophrenia spectrum and other psychotic disorders), 12.04 (depressive, bipolar and related disorders), or 12.06 (anxiety and obsessive-compulsive disorders), the claimant must satisfy the criteria of either paragraphs A and B or paragraphs A and C. 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(A)(2). Here, Plaintiff does not challenge the ALJ's findings as to the paragraph B criteria; instead, she argues that the ALJ failed to evaluate the paragraph C criteria. ECF No. 12 at 14-15.

Paragraph C provides an alternative means of demonstrating disability for those claimants who experience "serious and persistent mental disorders" and whose "more obvious symptoms" have been controlled by medication and mental health interventions. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(G)(1). To satisfy paragraph C criteria, a claimant must show (1) that her mental impairment has existed for at least two years, (2) that she relied "on an ongoing basis, upon medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s), to diminish the symptoms and signs of [his] mental disorder," and (3) that "despite [her] diminished symptoms and signs, [she has] achieved only marginal adjustment," meaning "that [her] adaption to the requirements of daily life is fragile; that is [she has] minimal capacity to adapt to changes in [her] environment or to demands that are not already part of [her] daily life." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(G)(2)(a)-(c).

16

25-CV-1424-GPC-MMP

"An ALJ must evaluate the relevant evidence before concluding that a claimant's impairments do not meet or equal a listed impairment." *Lewis v. Apfel*, 236 F.3d 503, 512 (9th Cir. 2001). Specifically, the ALJ must "discuss and evaluate the evidence that supports his or her conclusion," as a "boilerplate finding is insufficient." *Id*. at 512-13. However, the ALJ need not make this evaluation specifically under the "Findings" heading. *Id*.

For example, in *Gonzalez*, the Ninth Circuit held the multi-page, single-spaced summary of the record reciting the medical records and summarizing the appellant's testimony was sufficient, as the ALJ stated that the record substantiated some of appellant's complaint. *Gonzalez v. Sullivan*, 914 F.2d 1197, 1201 (9th Cir. 1990). Similar to this instant case, the ALJ did not "state what evidence supported the conclusion that appellant's impairments d[id] not meet or exceed the Listing of Impairments." *Id.* at 1200. The court explained that it is unnecessary for the ALJ to explain why a claimant failed to satisfy every section of the listing of impairments, and a four-page "evaluation of the evidence" was an adequate statement of the "foundations on which the ultimate factual conclusions are based." *Id.*; *Kruchek v. Barnhart*, 125 Fed. A'ppx. 825, 827 (9th Cir. 2005) (adequately analyzed evidence in the "Statement of the Case"); *Evenhus v. Astrue*, 815 F. Supp. 2d 1154, 1060 (D. Or. Aug. 2011) (ALJ properly assessed listing even though he did not discuss the findings in the paragraph addressing the listings because "ALJ thoroughly examined and detailed the medical evidence of record in the pages following his findings with respect to the listing criteria ...."); *Harris v. Astrue*, No. 08-CV-0831-JSW, 2009 WL 801347, at *7 (N.D. Cal. Mar. 25, 2009) (discussion and evaluation of evidence at step four supported ALJ's step three conclusion that impairments did not equal Listing 1.04)

Here, the ALJ addressed the standard to meet paragraph C criteria and then using boilerplate language concluded that "the evidence does not indicate that the claimant's

17

25-CV-1424-GPC-MMP

severe mental impairments are 'serious and persistent.'" AR 22. While the discussion as to the elements of paragraph C are not expressed under step 3 analysis, the ALJ conducted a detailed analysis of Plaintiff's mental condition to support his paragraph C conclusion. *See* AR 20-22, 23-26. Specifically, the ALJ found Plaintiff has a moderate limitation in interacting with others based on Plaintiff's reports that she has no problems getting along with others. AR 20. Even though Plaintiff was hospitalized in January 2022 for being a danger to others, the ALJ gave weight to mental status exams throughout the claimed period which generally found Plaintiff to be cooperative with calm behavior, engaging in conversation, and exhibiting good eye contact. *Id.* Her medication was also effective in treating her symptoms. *Id.* The ALJ also underscored how the medical record shows a gap in mental health treatment from 2019, before Plaintiff's alleged on-set date, until January 2022. AR 24. Further, the ALJ found that Plaintiff has moderate limitations in adapting or managing herself, noting that mental status exams consistently reported Plaintiff as alert and oriented to person, time, place, and purpose; to have fair insight and judgement; and to be neat, well-groomed, and appropriately dressed. AR 21. Additionally, Plaintiff cares for her two young children, showers and dresses independently, prepares simple meals, and can occasionally do housework. AR 24. The ALJ recognized the Plaintiff has moderate limitations in understanding, remembering, or applying information but disagreed as to further limitations in interacting with others and in managing oneself given evidence of generally normal mental status findings throughout the claimed period. AR 21. Accordingly, the ALJ's discussion of Plaintiff's testimony, prior hospitalization, and daily life management during the claimed disability period do not establish error in the ALJ's severity analysis. *See Kitchen v. Kijakazi¸* 82 F.4th 732, 741 (9th Cir. 2023) (finding substantial evidence supported the ALJ's conclusion that the record did not establish plaintiff's mental impairments had only

18

marginal adjustment when plaintiff responded well to medication, did not need extensive treatment, and maintained self-care, hygiene, and grooming).

Thus, the Court the ALJ adequately analyzed the evidence in arriving at its step-three determination.

## B.    Mental Residual Functional Capacity Finding

Second, Plaintiff contends that the ALJ failed to support her mental RFC finding with substantial evidence because the ALJ improperly disregarded certain psychiatric evaluations from Dr. Bishop and Dr. Joseph. ECF No. 12 at 18-20. In opposition, Defendant argues that substantial evidence supported the ALJ's RFC assessment because the ALJ appropriately considered all relevant evidence in finding that Plaintiff could perform a limited range of work. ECF No. 17 at 12-13.

The RFC assesses "an individual's ability to do sustained work-related physician and mental activates in a work setting on a regular and continuing basis" (i.e., eight hours a day, five day per week). Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). In essence, it is the most an individual can do despite their limitations. 20 C.F.R. § 416.945(a)(1). Where there is more than one impairment, the ALJ "will consider all of [the claimant's] medically determinable impairments of which we are aware, including [the claimant's] medically determinable impairments that are not 'severe,'…" *Id*. § 404.1545(a)(2).

The ALJ must consider both relevant medical evidence as well as "descriptions and observations of [the claimant's] limitations from [her] impairment(s), including limitations that result from [the claimant's] symptoms, such as pain, provided by [the claimant], family, friends, or other persons." 20 C.F.R. § 404.1545(a)(3). Within that consideration, "[i]f a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Trevizo v. Berryhill*, 871 F. 3d 664, 675 (9th

Cir. 2017) (quoting *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008)). When an ALJ gives a treating physician's opinion less than controlling weight, the ALJ must consider factors such as "length of the treating relationship, the frequency of examination, the nature and extent of the treatment relationship, or the supportability of the opinion." *Id*. at 676 (citing 20 C.F.R. § 404.1527(c)(2)-(6)). "[T]he ALJ must articulate how he considered the most important factors of supportability and consistency." *Kramer v. Kijakazi*, No. 20-cv-2065-GPC-AHG, 2022 WL 873630 at *9 (S.D. Cal. Mar. 24, 2022).

"Ultimately, the "ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence." *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (citing *Andrews v. Shalala*, 53 F.3d 1035, 1039-40 (9th Cir. 1995)) ("The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities."). However, an ALJ may not "cherry pick" evidence without considering its context in the record. *Ghanim v. Colvin*, 763 F.3d 1154, 1164 (9th Cir. 2014); *Garrison*, 759 F.3d at 1017 n.23 (9th Cir. 2014) (ALJ may not "cherry-pick" from mixed results to support a denial); *Holohan v. Massanari*, 246 F.3d 1195, 1207 (9th Cir. 2001) (holding that the ALJ erred in selectively relying on entries in the medical record while "ignor[ing] the many others that indicated continued, severe impairment").

Here, the Court agrees with Plaintiff that the ALJ cherry-picked findings and failed to provide specific and legitimate reasons for rejecting the two treating physicians' opinions. First, the ALJ failed to adequately explain his reasoning, specifically with how he "considered the supportability and consistency of the opinion." *Kathleen G. v. Comm'r of Soc. Sec.*, No. C20-461 RSM, 2020 WL 6581012 at *3 (W.D. Wash. Nov 10, 2020); *see also Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022) ("An ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence."). The ALJ stated that Dr.

20

Bishop's opinion is not persuasive because it is not "supported by Dr. Bishop's examinations of the [Plaintiff] (for example, his generally normal mental status exam findings…)" and because it was "not consistent with the longitudinal medical evidence." AR 25. Importantly, however, the ALJ appears to have overlooked or ignored the rest of the clinical findings beyond what he considered "normal" mental status reports. For example, the ALJ cites to appointments with Dr. Bishop as finding generally normal mental status throughout but fails to mention that Dr. Bishop also recorded Plaintiff's perceptions of auditory hallucinations during the same visits. AR 1058, 1169. Additionally, Dr. Bishop's findings from those appointments do not support a conclusion that Plaintiff's overall status was "normal." *Id.* Thus, the ALJ, in essence, improperly acted as his own medical expert when concluding that Dr. Bishop showed "normal mental status exam findings" throughout his reports. *See Miller v. Astrue*, 695 F. Supp. 2d 1042, 1048 (C.D. Cal. 2010) (underscoring that courts have repeatedly found it improper for an ALJ to "act as his own medical expert").

Next, while the ALJ fully credited and gave substantial weight to Dr. Joseph's opinions, he ignored Dr. Joseph's findings and diagnosis that supported Plaintiff's complaints of hallucinations and inability to maintain concentration. In his decision, the ALJ summarized Dr. Joseph's report of October 14, 2023 as follows: Plaintiff "has the ability to reason, understand, and remember simple instructions without restrictions," and has moderate impairments to "retain and carry out detailed and complex instructions, maintain concentration, persistence and pace, socially interact with the public and coworkers, and adapt to the external environment." AR 25. However, the ALJ ignored Dr. Joseph's findings that Plaintiff experienced "ongoing psychotic symptoms" and "auditory hallucinations that distract and interfere with accurate decision making." AR 1294. The ALJ also did not mention that Dr. Joseph reported that Plaintiff could sustain

25-CV-1424-GPC-MMP

activity for a limited period of thirty to forty-five minutes as Plaintiff gets easily overwhelmed. AR 1299.

Furthermore, an ALJ's opinion is not supported by specific, legitimate reasons if the diagnoses of a non-examining medical expert are similar to the diagnoses of treating physicians but differ only as to their conclusions. *See Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007) ("When an examining physician relies on the same clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions of the examining physician are not "substantial evidence."). Here, Dr. Joseph is a non-examining medical expert, and Dr. Bishop is a treating physician. The diagnoses concerning Plaintiff's auditory hallucinations and distractibility rendered by Dr. Bishop are similar to Dr. Joseph and clinicians from CHE Behavioral Health Services. They differ only as to their conclusions. However, the ALJ relied on the "normal" mental health conclusions to disregard Dr. Bishop's medical opinion but accept Dr. Joseph's. As such, the ALJ's reliance on the "normal" mental health conclusions to reject the treating physicians' opinions does not constitute specific and legitimate reasons. *See Orn*, 495 F.3d 625 at 632.

By failing to consider Dr. Bishop's medical opinion and selectively choosing only the parts of Dr. Joseph's opinion to support his RFC determination, the Court concludes that the ALJ failed to reject the treating physician's opinion with specific and legitimate reasons thereby providing an incomplete FRC assessment. *See Hill v. Astrue*, 698 F.3d 1153, 1161 (9th Cir. 2012).

### C.    Evaluation of Plaintiff's Subjective Testimony

An ALJ must undergo a two-step analysis to determine whether a claimant's testimony regarding subjective pain and other symptoms is credible. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007). First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that

25-CV-1424-GPC-MMP

"could reasonably be expected to produce the pain or other symptoms alleged." *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (*en banc*) (internal quotation marks omitted). When the claimant meets the first step and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of her symptoms "by offering specific, clear and convincing reasons for doing so." *Smolen v. Chater*, 80 F.3d 1273, 1281, 1284 (9th Cir. 1996); *see also Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) ("[g]eneral findings are insufficient."). The "specific, clear, and convincing" standard requires the ALJ to identify which part of the testimony is not credible and explain which evidence contradicts that testimony. *Lambert v. Saul*, 980 F.3d 1266, 1277 (9th Cir. 2020).

The decision "must contain *specific reasons* for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to…any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015) (emphasis in original) (quotations omitted). The ALJ "[m]ay consider a range of factors in assessing credibility, including (1) 'ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.'" *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) (quoting *Smolen*, 80 F.3d at 1284). Additionally, while "an ALJ may not reject a claimant's subjective complaints based solely on a lack of medical evidence to fully corroborate the alleged severity of pain" a lack of medical evidence "is a factor that the ALJ can consider in his credibility analysis." *Burch v. Barnhart*, 400 F.3d 676, 680-81 (9th Cir. 2005).

Plaintiff contends that the ALJ failed to provide clear and convincing reasons to disregard Plaintiff's subjective symptom testimony and long medical record and provided daily activities which are incompatible with Plaintiff's limitations. ECF No. 12 at 20-22. Defendant disagrees, arguing that the ALJ properly rejected Plaintiff's subjective complaints because medical evidence and her daily activities did not corroborate the severity of symptoms alleged. ECF No. 17 at 14-19.

Here, at step one, the ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms," which included hearing voices every day, becoming triggered by stress, experiencing anxiety and depression, having difficulty concentrating, and having such a lack of energy that it made it difficult to move, clean, or bathe herself. AR 23; *see also Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). However, at step two, the ALJ rejected Plaintiff's subjective symptom testimony, concluding that "the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not consistent with the medical evidence and other evidence in the record." AR 23. Therefore, the Court must determine whether the ALJ supplied clear, specific, and convincing reasons for disregarding Plaintiff's subjective symptom testimony. *See Lingenfelter*, 504 F.3d at 1036.

In his step two analysis, the ALJ appears to reject Plaintiff's subjective symptom testimony for two reasons: (1) Plaintiff's medical record "shows a gap in mental health treatment" and improvements in her condition after medication adjustments, and (2) Plaintiff testified that she could participate in daily activities, contradicting Plaintiff's other reports on her condition, like difficulty getting out of bed or off the couch. AR 24.

### 1.    Medical Record

The ALJ asserts that the Plaintiff's statements about the "intensity, persistence, and limiting effects of [her] symptoms are not entirely consistent with th[e] objective medical

24

evidence and other evidence." AR 24. This Court finds the ALJ merely summarized the "opinion evidence" and failed to identify specific statements from Plaintiff's testimony or function report that were not credible.

"An ALJ's vague allegation that a claimant's testimony is not consistent with the objective medical evidence, without any specific findings in support of that conclusion, is insufficient ..." *Treichler*, 775 F.3d at 1103. "The ALJ must identify the testimony that was not credible, and specify what evidence undermines the claimant's complaints." *Id.* (citing *Reddick*, 157 F.3d at 722). Furthermore, the ALJ's findings "must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain." *Meneses v. Berryhill*, No. 16-CV-1061-PLA, 2017 WL 598759, at *4 (C.D. Cal. Feb. 14, 2017) (citing *Brown-Hunter*, 806 F.3d at 493).

In the ALJ's opinion, the ALJ concluded that the medical evidence is inconsistent with Plaintiff's statements regarding the intensity, persistence, and limiting effects of her symptoms. AR 23. First, the ALJ cited medical visits during the claimed period where Plaintiff reported improvement after adjustments to her medication. AR 24. Second, the ALJ highlighted gaps in treatment from 2019 to January 2022, concluding they were "another indication that her mental symptoms are not as significant as alleged." *Id.* Finally, the ALJ cited to hospital visits related to her pregnancy which report Plaintiff as "well-nourished, well-developed, alert and oriented to person, place, and time, had normal mental status, and had appropriate mood and affect." *Id.* The Commissioner maintains that this reasoning displays the required level of specific reasoning.

Gaps in treatment can be considered in assessing a Plaintiff's credibility. *See Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012); *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). However, the Commissioner's improvement and mental status arguments are less persuasive.

25

First, not all improvements as to an individual's condition mean the impairment is no longer disabling. "[T]reatment may not resolve all of the limitations that result from your mental disorder." 20 C.F.R. § Pt. 404, Subpt. P, App. 1 (2025). Thus, there must be "evidence of medical treatment successfully relieving symptoms," such as when an individual is able to "return to a level of function close to the level of function they had before they developed symptoms." *Wellington v. Berryhill*, 878 F.3d 867, 876 (9th Cir. 2017) (citations omitted). Only "[i]mpairments that can be controlled effectively with medication are not disabling for the purposes of determining eligibility for SSI benefits." *Warre v. Comm'r*, 439 F.3d 1001, 1006 (9th Cir. 2006). However, beyond noting "the claimant reported improvement or stability after adjustments to her medication," AR 24, the ALJ does not provide reasoning as to whether the treatment effectively controlled Plaintiff's impairments enough to be categorized as "not disabling."

Second, while the ALJ attempted to reject Plaintiff's subjective symptom testimony using "normal" mental health reports, the ALJ neglected to consider that "an individual may suffer from anxiety and bipolar disorders and still present with 'normal' mental health status findings." *Wendi D. v. SSA*, Case No. 24-CV-08207-RFL, 2025 WL 23733362, at *8 (N.D. Cal. Aug. 14, 2025). Importantly, "a mental health status examination that measures cognitive capacity and current emotional state is not screening or diagnosing whether an individual has anxiety or bipolar disorders." *Id.*; *see Ghanim v. Colvin*, 763 F.3d 1154, 1164 (9th Cir. 2014) (noting that "observations of cognitive functioning during therapy sessions [did] not contradict [the plaintiff's] reported symptoms of depression and social anxiety"). Although the ALJ noted in his decision that "some examinations did indicate an irritable mood, constricted affect, or guarded attitude," he did not explain why these findings were disregarded to support his non-credibility determination beyond pointing to the "normal" mental health reports. AR 24; *see Garrison*, 759 F.3d at 1017 ("[W]hile discussing mental health issues, it is error to

26

reject a claimant's testimony merely because symptoms wax and wane in the course of treatment."). The ALJ also failed to consider the auditory hallucinations that Plaintiff had experienced for years, which both Dr. Bishop and Dr. Joseph had identified. AR 963, 1294.

Moreover, the "normal" mental health status examinations taken during Plaintiff's pregnancy "have less weight because they were not conducted by mental health specialists." *Wendi D.*, 2025 WL 23733362, at *8. "[G]reater weight is due to the 'opinion of a specialist about medical issues related to his or her area of specialty.'" *Jeanne R. v. Saul*, No. 19-cv-09809, 2020 WL 4673460, at *7 (C.D. Cal. Aug. 12, 2020) (citing 20 C.F.R. § 404.1527). The emergency department and pre-natal doctors upon which the ALJ relies, may "have thought it beyond [their] capacity to inquire or comment about mental health symptoms." *Diedrich v. Berryhill*, 874 F.3d 634, 641 (9th Cir. 2017) (finding that an orthopedist's lack of reporting on claimant's mental health impairments "says little about the extent to which [claimant] may in fact have been suffering from such symptoms" because one would not necessarily expect an orthopedist to note them in their report); *see also L.L. v. Kijkazi*, Case No. 20-CV-07438-JCS, 2022 WL 2833972, at *12 (N.D. Cal. July 20, 2022) ("Ultimately, the ALJ erred in determining that isolated observations of unremarkable mental status within non-psychiatric treatment records should discredit the opinions of [plaintiff's] treating providers.").

Given the ALJ's lack of adequate explanation regarding improvement, gaps in treatment, and Plaintiff's "normal" mental health status updates, as well as the ALJ's error in rejecting Dr. Bishop's opinion discussed above, this Court finds ALJ did not provide specific, clear, and convincing reasons to discount Plaintiff's testimony based on her medical record. *See Brown-Hunter*, 806 F.3d at 494 ("Our review of the ALJ's written decision reveals that she did not specifically identify any such inconsistencies; she simply stated her non-credibility conclusion and then summarized the medical evidence

27

25-CV-1424-GPC-MMP

supporting her RFC determination."); *see also* Social Security Ruling (SSR) 16—3p (S.S.A. Oct. 25, 2017) (stating that SSA adjudicators should "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual.").

### 2.    Daily Activities

An ALJ may consider Plaintiff's daily activities in order to make a credibility determination. *See e.g.*, *Diedrich*, 874 F.3d at 648; *Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002); *see also* 20 C.F.R. § 404.1529(c)(3)(i) (listing daily activities as a factor the ALJ considers in determining the nature and severity of claimant's symptoms). However, "the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from [his] credibility as to [his] overall disability." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001). "One does not need to be 'utterly incapacitated' in order to be disabled." *Id.* (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)). The Ninth Circuit has stated that "if a claimant is able to spend a substantial part of [their] day engaged in pursuits involving the performance of physical functions that are transferable to a work setting," the ALJ may be justified in disregarding the claimant's symptom testimony. *Fair*, 885 F.2d at 603. In other words, the ALJ may only disregard the Plaintiff's subjective symptom testimony if the level of Plaintiff's daily activities is inconsistent with her claimed limitations. *Reddick*, 157 F.3d at 722.

Here, the ALJ referred to various specific activities of Plaintiff's daily living, including caring for her two young children, preparing simple meals, occasionally performing housework like laundry and sweeping, and independently showering and dressing. AR 24. The ALJ also noted Plaintiff has a friend she sees every other week. *Id.*

28

In providing these descriptions, the ALJ ignores testimony necessary to understand the scope of Plaintiff's activities. *See Garrison*, 759 F.3d at 1016 (finding the ALJ's selective presentation of daily activities was erroneous for failing to note plaintiff had to rest between activities, needed help to do the activities, and could not always complete the activities given her pain). As to Plaintiff's ability to care for her children, the ALJ did not consider Plaintiff's testimony in her function report that she takes her children to her mother-in-law's home for help with childcare, AR 228, nor her husband's testimony that his mother cares for their children five days a week, AR 217. As to Plaintiff's self-care, the ALJ also did not consider that Mr. Leidle reported he must remind Plaintiff each day to take her medication and, on some days, to take a shower. AR 218. Mr. Leidle also reminds Plaintiff to get groceries and encourages her to complete household chores like sweeping or wiping down counter tops. AR 218-20. The ALJ did not mention this relevant testimony in his decision or during the hearing. As to Plaintiff's socialization, during the hearing, Plaintiff reported that she "really only interact[s] with family members" and that she does not "have any friends." AR 48.

Thus, because the ALJ did not examine the full scope of Plaintiff's daily activities in his opinion, he too narrowly construed Plaintiff's testimony. See *Garrison*, 759 F.3d at 1017 ("Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working."). The activities identified are not inconsistent with the identified symptoms, especially when considered with the above testimonial details, and therefore do not lead to the conclusion that her performance of physical functions are transferable to a work setting.

In addition to not addressing these limitations in Plaintiff's daily activities, the ALJ did not offer specific, clear, and convincing reasons to disregard the limitations. *See*

29

*Diedrich*, 874 F.3d at 643 ("That [plaintiff] could participate in some daily activities does not contradict the evidence of otherwise severe problems that she encountered in her daily life during the relevant period."). For example, the ALJ noted that Plaintiff can cook simple meals and sleeps eight hours. Additionally, the ALJ observed that Plaintiff "cares for her 2 young children" and "can occasionally do laundry, vacuum, sweep, and wipe down counters." AR 24. However, the ALJ does not provide any explanation as to why these activities cannot coexist with the limitations and symptoms identified by doctors and Plaintiff. Specifically, Plaintiff's testimony states that she had difficulty getting out of bed or off the couch. *Id.* Moreover, both Dr. Bishop and Dr. Joseph acknowledged that Plaintiff experiences auditory hallucinations that are distracting and interfere with accurate decision making. AR 963, 1294.

Here, Plaintiff's efforts to participate in daily activities such as housework and cooking are not necessarily signs that she is without a disability. Rather, such efforts show that she endeavors to live a normal life in spite of her mental health. Thus, this Court finds ALJ did not provide specific, clear, and convincing reasons to discount Plaintiff's testimony based on her daily activities.

### D.   Burden of Proof at Step Five

Lastly, Plaintiff argues that the ALJ failed to provide substantial evidence at step five supporting that Plaintiff could perform alternative jobs of sealer, inspector, and hand packager because the jobs conflict with the RFC. ECF No. 12 at 22-23. Defendant contends substantial evidence supports the ALJ's step five findings because the ALJ reasonably concluded Plaintiff could perform other work as supported by the VE's testimony. ECF No. 17 at 19-21.

At step five of the sequential evaluation process, "the burden shifts to the Commissioner to prove that the claimant can perform a significant number of jobs that exist in the national economy given the claimant's [RFC], age, education, and work

25-CV-1424-GPC-MMP

experience." *Kilpatrick v. Kijakazi*, 35 F.4th 1187, 1191 (9th Cir. 2022) (internal citations omitted).

Here, because the Court has found that the ALJ erred in evaluating Plaintiff's subjective testimony, the ultimate disability determination may change on remand once the ALJ makes a credibility determination with specific, clear and convincing reasons. Therefore, the Court need not reach Plaintiff's arguments pertaining to the ALJ's step five findings as step five will need to be reconsidered on remand. *See Erica A. U. v. Comm'r of Soc. Sec.*, Case No. 3:21-CV-5005-DWC, 2022 WL 110455, at *4 (W.D. Wash. Jan. 12, 2022) (declining to address step five arguments due to remand to reconsider step five); *Wilson v. Astrue*, No. CV 10–03217–JEM, 2011 WL 1812501, at *10 (C.D. Cal. May 12, 2011) (no need to address step five because ALJ's errors undermine the RFC and the step five determination). On remand, the ALJ should reassess Plaintiff's RFC after articulating specific, clear and convincing reasons why Plaintiff's subjective testimony is not credible and then reassess step five.

**IV.    Harmless Error**

The Court now turns to the analysis of whether the ALJ's errors were harmless. *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) (citing *Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006)). If an ALJ's error is harmless, his decision will not be reversed. *Carmickle v. Comm'r Soc. Sec. Admin*, 533 F.3d 1155, 1162 (9th Cir. 2008). An error is harmless "where it is inconsequential to the ultimate nondisability determination." *Molina*, 674 F.3d at 1115 (citing *Stout*, 454 F.3d at 1054). In other words, a court must determine whether the ALJ's conclusion is supported by substantial evidence despite the error. *Blacksher v. Berryhill*, 762 F. App'x 372, 376 (9th Cir. 2019) (citing *Carmickle*, 533 F.3d at 1162). Courts look to the record as a whole to determine whether the error alters the outcome of the case. *Molina*, 674 F.3d at 1115.

25-CV-1424-GPC-MMP

Here, the record establishes that the ALJ's reasons for their rejection of Plaintiff's subjective symptom testimony are insufficiently, "specific, clear, and convincing." *Smolen*, 80 F.3d at 1281. Consequently, the ALJ's credibility assessment lacks substantial evidence. This error was not harmless because it impacted the RFC formulated by the ALJ. AR 26.

**V.     Conclusion**

For the foregoing reasons, the Court REVERSES the decision of the Commissioner and REMANDS this matter to the ALJ for further administrative proceedings consistent with this order.

**IT IS SO ORDERED.**

Dated:  May 26, 2026

Hon. Gonzalo P. Curiel
United States District Judge

32

25-CV-1424-GPC-MMP